# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| T.C. MARTIN,<br>        Plaintiff | |
| v. | C.A. No. 08-316 Erie |
| CONSOLIDATED RAIL<br>CORPORATION, et al.,<br>        Defendants. | **District Judge McLaughlin**<br>**Magistrate Judge Baxter** |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.  RECOMMENDATION**

It is respectfully recommended that Defendants' motion for summary judgment [ECF No. 16] be granted.

**II.  REPORT**

    **A.  Relevant Procedural and Factual History**

On November 14, 2008, Plaintiff T.C. Martin initiated this action pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, *et seq*., against Defendants Consolidated Rail Corporation ("Conrail") and CSX Transportation, Inc. ("CSX"). Plaintiff began working for the Defendants as "a machine operator on a traveling gang" on April 19, 1976. (ECF NO. 1, Complaint, at ¶ 10). Plaintiff last worked for Conrail on May 31, 1999, at which time he joined CSX. (See ECF No. 16-5, Plaintiff's Answers to Defendants' Interrogatories, at ¶ 7). While performing work for CSX in South Carolina in February 2006, Plaintiff felt pain in his back and legs and was transported by a fellow employee to the emergency room, where an MRI of his lower back was taken. (See ECF No. 16-7, transcript of Plaintiff's deposition testimony, at pp. 14-15 (internal pp. 47-51)). The results of the MRI were sent to Craig T. Johnston, D.O. ("Dr. Johnston"), Plaintiff's family physician in Erie, Pennsylvania. (Id. at pp. 13, 15 (internal pp. 45, 51)). The MRI report, dated February 6, 2006, revealed "prominent L4-L5 degenerative disk

1

change with large diffuse disk herniation," "small midline L5-S1 disk herniation," and "even smaller midline herniation at L3-L4 with cephalad extrusion." (ECF No. 16-11, transcript of Dr. Johnston's deposition testimony, at p. 31). Plaintiff did not return to work after receiving the MRI results.

Plaintiff alleges that he "was exposed to excessive and harmful cumulative trauma to his back due to the bending, lifting and twisting with which he performed his work for the Defendants." Plaintiff claims further that his back injuries were "caused in whole or in part by the negligence, carelessness and recklessness of the Defendants." (Id. at ¶ 13).

On March 23, 2010, Defendants filed a motion for summary judgment [ECF No. 16] arguing that (i) Plaintiff's claim is barred by the applicable statute of limitations and, alternatively, (ii) Plaintiff has failed to present sufficient evidence that his injuries were caused by Defendants' negligence. [ECF No. 16]. Plaintiff has since filed a memorandum of law in opposition to Defendants' motion [ECF Nos. 20], to which Defendants have filed a sur-reply [ECF No. 22]. This matter is now ripe for disposition.

### C.    **Standards of Review**
####     **1.    Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. See Fed.R.Civ.P. 56(c); Krouse v.

2

American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997).  The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990).  Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial.  Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment).  The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will affect the outcome of the case under applicable law.  Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986).  Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).  Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson, 477 U.S. at 247-249.

**C. Discussion**

**1. Statute of Limitations**

To maintain an action under FELA, a lawsuit must be "commenced within three years from the day the cause of action accrued." 45 U.S.C. § 56. "For injuries which do not manifest themselves immediately, a claim accrues when plaintiff is aware [he] is injured and is aware that defendant's conduct caused [his] injury." Veloz v. Norfolk Southern Ry. Co., 2007 WL 1875818 at * 1 (W.D.Pa. June 27, 2007), citing Matter of Central R. Co. Of New Jersey, 950 F.2d 887, 891 (3d Cir. 1991), cert. denied 503 U.S. 971 (1992), citing Kichline v. Conrail, 800 F.2d 356, 358 (3d Cir. 1986); see also Tolston v. National R.R. Passenger Corp., 102 F.3d 863, 865 (7th Cir. 1996)(holding that "a cause of action [under FELA] accrues for statute of limitation purposes when a reasonable person knows or in the exercise of reasonable diligence should have known of both the injury and its governing cause")(citation omitted). In such cases, Plaintiff "bears the ultimate burden of establishing that he filed suit within three years of both the date he was aware of his injury and the date the cause of his injury was or should have been discovered," McCain v. CSX Transportation, Inc., 708 F.Supp.2d 494, 498 (E.D.Pa. 2010), citing Kichline, 800 F.2d at 361.

At the summary judgment stage, however, Defendants, as the moving parties, must show the absence of a genuine issue of material fact as to whether Plaintiff knew or should have known of the existence and cause of the injury more than three years before the date he filed suit. McCain, 708 F.Supp.2d at 498, citing Fed.R.Civ.P. 56(c). In response, Plaintiff then bears the burden of pointing to facts of record that raise a genuine issue of material fact as to whether the injury and its cause were discoverable within the three years prior to the date suit was filed. Id.

Here, Defendants contend that Plaintiff failed to initiate the instant action within the applicable limitations period because he "knew about the onset of his symptoms well in excess of three years before the date he originally filed suit in this case, November 18, 2008." (ECF No. 17, Defendants' Memorandum of Law, at p. 13). Defendants base this contention on the fact that Plaintiff had experienced lower back pain at least as early as December 2002, when an x-ray

4

revealed early signs of osteoarthritis of the L4-L5 intervertebral space, one of the areas where disk herniation was later discovered in February 2006. (See ECF No. 16-11, transcript of Dr. Johnston's deposition testimony, at p. 31). As a result, Plaintiff underwent a course of physical therapy of unspecified duration beginning at the end of 2002. In addition, one of Plaintiff's treating physicians, Rodney Bingham, M.D. ("Dr. Bingham"), testified at his deposition that Plaintiff reported that he had experienced back pain for "years prior to onset February 2006." (See ECF No. 16-8, transcript of Dr. Bingham's deposition testimony, at p. 7 (internal p. 20). More specifically, in his written report to Plaintiff's counsel, dated July 8, 2009, Dr. Bingham stated that "[t]he history provided by [Plaintiff] indicates that his pain and symptom onset was during the 5 years prior to our initial evaluation," which occurred on July 11, 2006. (Id. at pp. 14-16).

Other than the x-ray report of December 2002, however, there are no medical notes or documents of record establishing that Plaintiff was experiencing ongoing back problems prior to February 2006. In fact, the deposition testimony of both Plaintiff and his family physician, Dr. Johnston, indicate otherwise. In particular, Plaintiff testified that he underwent physical therapy for his back in the "winter of 2002, going into 2003" because he was experiencing "a few little twinges in [his] muscles back there like [he] had a pulled muscle back there." (See ECF No. 16-7, transcript of Plaintiff's deposition testimony, at p. 43 (internal pp. 162-163)). Plaintiff testified further that, because his back pain in 2002 was perceived to be muscular in nature, it was different from the back pain he is presently experiencing from his herniated disks. (Id.). Similarly, Dr. Johnston testified that Plaintiff's back pain in 2002 warranted "just a one or two-time visit" and "didn't really seem to be much in the way of a problem," despite the referral for physical therapy. (ECF No. 16-11, transcript of Dr. Johnston's deposition testimony, at p. 9). Dr. Johnston testified further that, although he saw Plaintiff "several times after that, [Plaintiff] did not have any back pain or we didn't address back pain" until February 18, 2006. (Id.).

The disparity of testimony regarding the nature and severity of Plaintiff's prior back problems in 2002, coupled with the absence of contemporaneous medical records documenting such problems, raises a genuine issue of material fact as to whether Plaintiff knew or should

5

have known of the existence and cause of the injuries of which he now complains more than three years prior to the date he filed the instant suit. Accordingly, Defendants' motion for summary judgment based upon Plaintiff's alleged failure to file suit within the applicable three-year limitations period should be denied.

### 2. Causation

In under to recover under FELA, it is incumbent upon Plaintiff to prove that Defendants were negligent and that such negligence was the proximate cause in whole or in part of Plaintiff's injuries. Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 32 (1944)(citation omitted). Proof of an employer's negligence is a prerequisite for recovery under FELA. Stone v. New York C. & St. L. Ry., 344 U.S. 407, 409 (1953). Mere "speculation cannot supply the place of proof." Moore v. Chesapeake & Ohio Ry. Co., 340 U.S. 573, 576 (1951). Rather, Plaintiff is "required to present probative facts from which the negligence and the causal relation could reasonably be inferred." Tennant, 321 U.S. at 32. In this regard, Plaintiff must present more than a mere "possibility" that Defendants' negligence caused his alleged injuries. Augenstein v. Norfolk Southern Ry. Corp., 2005 WL 1657059 at * 4 (N.D.Ohio July 14, 2005). Negligence is not presumed upon mere proof that an injury occurred. Conway v. Consolidated Rail Corp., 720 F.2d 221 (1st Cir. 1983), cert. denied 466 U.S. 937 (1984).

Here, Plaintiff lists in his Complaint a number of ways in which Defendants were allegedly negligent. (ECF No. 1, Complaint, at ¶ 13).[1] However, during his deposition, Plaintiff

---

[1]

This list was essentially summarized by Plaintiff in his discovery responses, as follows:

1) Failure to establish a working ergonomic program to address and monitor repetitive stress injuries in the workplace;

2) Failure to proactively address the risk factors associated with the development of repetitive stress injuries;

3) Failure to upgrade railroad yard shops and tools in order to provide the workers with a safe working environment;

4) Failure to provide [Plaintiff] with sufficient manpower and equipment to perform his

6

consistently described a work environment where employee safety was continually stressed by Defendants. In particular, the Court notes the following excerpts from Plaintiff's deposition transcript:

> Q. Did you have any problems with those hand tools that you had to use?
>
> A. What do you mean problems with it?
>
> Q. Were they in good condition, okay to use?
>
> A. Well, you make sure they was in good condition because you'd have people that'd come around and inspect them. Plus, you inspect your tools every morning before you get on that machine. You inspect your machine, you inspect your tools and everything. (ECF No. 16-7 at p. 32 (internal p. 118)).
>
> \* \* \*
>
> Q. And if you found a problem with your machine, what would you do?
>
> A. You have to report it to the mechanics. Every morning you have a slip to fill out, every morning. If something's wrong with that machine, you write it on your report and you give it to the mechanics. (Id. (internal p. 121)).
>
> \* \* \*
>
> Q. Did you ever use a machine that you felt was unsafe to operate?
>
> A. No. If I had a machine that I thought was unsafe to operate, you get a red tag. You fill out this red tag, bam, put it on the machine.
>
> Q. And you had the power to do that?
>
> A. Yes. (Id. at p. 33 (internal p. 123)).
>
> \* \* \*
>
> Q. But it sounds like you were given a lot of empowerment with your job. Do you agree with that?
>
> A. Yeah.

---

job in a safe manner;

5) Failure to provide Plaintiff with a safe place to work.

(ECF No. 16-5, Plaintiff's Answers to Defendants' Interrogatories, at ¶ 30).

7

Q. And you would take breaks if it was too hot or too cold; right?

A. Yeah.

Q. In fact, you had to, the company mandated them?

A. Yeah, yeah. (Id. at p. 37 (internal pp. 139-140)).

    *      *      *

Q. You never had a problem getting a new tool?

A. No, you just had them bring you the tool. They got that right in the safety rules. If a tool's not safe, don't use it.

Q. And speaking of safety rules, you had rule books?

A. Yeah.

Q. And you had rule books for both companies?

A. Yeah.

Q. You had to know those rules?

A. Excuse me?

Q. It was your responsibility to know those rules, correct?

A. Yeah, well, not really because they read a different rule every morning. I mean, you would know this book back to back, but you could study it. The foremans [sic] had to study it and know it pretty good but you got it read to you every morning and that way it'd be fresh in your mind, you know.

Q. But generally, you knew the safety rules; right?

A. Yeah, I knew most of them. They taught you a lot of safety out there, yeah.

Q. And you were tested on the safety rules?

A. Yeah, yeah. (Id. at p. 38 (internal pp. 142-143)).

    *      *      *

A. Anything that was unsafe you could refuse to do it, but you'd have to be able to prove that it's unsafe if the A-foreman walked up and said, what's going on here? This foreman asked me to do this and it's unsafe because of this, because of that, because of that. Well, okay. Let's see can we make it safe and then we'll do the job.

Q. And have you ever had a situation like that happen to you?

8

A. Yeah, a couple times. Not a lot.

Q. But it happens?

A. Yeah, it happens on the railroad.

Q. And from what it sounds like, it would be then you and whatever foreman would work together to correct the safety concern?

A. There you go.

Q. And then you guys all move forward with the job?

A. All move forward again.

Q. You would agree that you received a lot of training on the railroad, right; videos, tests, presentations, classes?

A. Yes, yes.

Q. Do you recall of all that training, receiving anything in regard to proper lifting techniques?

A. Yeah, yeah.

Q. Do you remember what that training consisted of?

A. In proper lifting?

Q. Yeah.

A. Not too much. Only that you lift with your legs and not your back.

Q. Was there any training or rule for that matter that said if you need help, ask for it?

A. There you go, yes.

Q. Was there any rule or training that instructed you to work within your own physical means; what you're capable of doing?

A. Yes.

Q. Do you remember if there's any like safety rules about over exerting and not to over exert?

A. Yeah, that's why you stop when it gets too hot out there.

Q. How about if something was too heavy? Does it tell you not to overexert when lifting something?

A. Well, they tell you if something is too heavy then you call for help. You don't try to do it by yourself. (Id. at pp. 38-39

9

(internal pp. 145-147)).

                \*                \*                \*

Q. Did you ever have to use or were you ever provided with back belts?

A. Yeah.

Q. Did you use them on occasion?

A. Yeah, you could use them. It all depended on what you were doing because that thing'll ride all the way up, you know. It's just uncomfortable thing to do when you're bending over all day trying to do something, it's just too uncomfortable. It's hot, it's uncomfortable. It don't stay in place. It rides up and it's just a pain in the tail, you know....

Q. Okay. Do you recall with CSX, the safety certification trainings that go out once a year?

A. Yeah.

Q. You remember those covered like a wide variety of safety topics?

A. It's been a while ago, but yeah.

Q. I know you were on a traveling gang but did you guys have a safety committee?

A. Yes.

Q. Were you a member of the safety committee?

A. Nope, never. (Id. at pp. 39-40 (internal pp. 149-151)).

In short, Plaintiff has failed to present any probative facts from which Defendants' negligence may reasonably be inferred. Tennant, 321 U.S. at 32.[2] On this basis alone Defendants' summary judgment motion should be granted.

Moreover, even if Defendants' negligence could be inferred, Plaintiff has failed to present any evidence establishing more than a mere "possibility" that any such negligence

---

[2] In fact, when given the opportunity to identify any unsafe work conditions he experienced while working for Defendants, Plaintiff cited only extreme weather conditions and working at night; yet, he acknowledged that no doctor ever informed him that such conditions caused his back problems. (Id. at pp. 37-38 (internal pp. 140-141; 143-144)).

10

caused his alleged injuries. Indeed, Plaintiff acknowledged during his deposition that doctors "said it's a possibility [his injuries] could've come from the railroad." (ECF No. 16-7 at p. 11 (internal p. 37). In fact, in response to questions regarding his written medical opinion provided to Plaintiff's counsel, Dr. Bingham conceded that he is unable to give an opinion as to whether Plaintiff's back injuries were caused by his work:

> Q. Okay. You make an opinion that the repetitive lifting of heavy work equipment and material and the repetitive axial loading of [Plaintiff's] lumbar spine during the use of his work tools, would have contributed to the lumbar pain appreciated. Have I read that correctly?
>
> A. Yes, that's correct.
>
> Q. And in a nutshell, **what you are saying is that his work caused him pain?**
>
> A. **Yes, it contributed to his symptom of pain.**
>
> Q. Okay. And then you continue by saying, you cannot estimate the extent to which these repetitive activities would have contributed to abnormalities of his lumbar spine and subsequently to the spinal nerves that extend to and from his lower extremities, accounting for the lower extremity symptoms described in the above narrative. Have I read that correctly?
>
> A. That's correct.
>
> Q. And in a nutshell, **does that mean that you cannot opine that the work caused the disc degenerations that you referenced earlier?**
>
> A. **Yes.**

(ECF No. 16-8, transcript of Dr. Bingham's deposition testimony, at p. 7 (internal pp. 18-20)) (emphasis added).

Thus, the most to which Plaintiff's medical expert can attest is that Plaintiff's work contributed to his symptom of pain.[3] This is insufficient to establish a causal relationship

---

[3]

It's worth noting that Plaintiff's longtime family physician, Dr. Johnston, was not asked by Plaintiff to formulate an opinion regarding the cause of Plaintiff's back injuries. (See ECF No. 16-11, transcript of Dr. Johnston's deposition testimony, at p. 16). Dr. Bingham is the only medical doctor who has been asked to offer such an opinion. In this regard, the Court acknowledges that Defendants have separately filed a motion to exclude Dr. Bingham's report and testimony regarding medical causation [ECF No. 26]; however, the Court finds it unnecessary to address that motion at this stage because the Court finds Dr. Bingham's opinion insufficient to establish medical causation in

between Defendants' alleged negligence and Plaintiff's underlying back injuries. See <u>Mayhew v. Bell S.S. Co.</u>, 917 F.2d 961, 964 (6th Cir. 1990)("medical expert must be able to articulate that it is likely that the defendant's negligence, or more than possible that the defendant's negligence, had a causal relationship with the injury and disability for which the plaintiff seeks damages....").

Because the record is devoid of evidence upon which either Defendants' negligence, or a causal relationship between such alleged negligence and Plaintiff's injuries, can reasonably be inferred, summary judgment should be granted in favor of Defendants and against Plaintiff.

## III    CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendants' motion for summary judgment [ECF No. 16] be granted.

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed.R.Civ.P. 72(b)(2), the parties are allowed fourteen (14) days from the date of service to file written objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of some appellate rights. See <u>Nara v. Frank</u>, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: November 17, 2010

cc:     The Honorable Sean J. McLaughlin
        United States District Judge

---

any event. If this Court's recommendation is adopted by the district judge, Defendants' motion to exclude Dr. Bingham's report and testimony will be dismissed as moot; however, if the district judge chooses to reject this Court's recommendation, said motion will remain pending and will be decided prior to trial.